IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

ENTERED
07/21/2010

|                          |   |                            |
|--------------------------|---|----------------------------|
| IN RE                    | ) |                            |
|                          | ) |                            |
| BRENTWOOD GROUP NO. 1 LTD., | ) | CASE NO. 10-80093-G3-11 |
| BRENTWOOD GROUP NO. 2 LTD., | ) | CASE NO. 10-80208-G3-11 |
| BRENTWOOD GROUP NO. 3 LTD., | ) | CASE NO. 10-80209-G3-11 |
|                          | ) |                            |
| Debtors,                 | ) | (JOINTLY ADMINISTERED)     |
|                          | ) |                            |

MEMORANDUM OPINION

The court has held an evidentiary hearing on the
"Motion for Relief from the Automatic Stay" (Docket No. 68) filed
by Pacific Western Bank.  The following are the Findings of Fact
and Conclusions of Law of the court.  A separate Judgment will be
entered granting the motion.  To the extent any of the Findings
of Fact are considered Conclusions of Law, they are adopted as
such.  To the extent any of the Conclusions of Law are considered
Findings of Fact, they are adopted as such.

Findings of Fact

Brentwood Group No. 1, Ltd. filed a voluntary petition
under Chapter 11 of the Bankruptcy Code on February 25, 2010.
Brentwood Group No. 2, Ltd. and Brentwood Group No. 3, Ltd. filed
voluntary petitions under Chapter 11 of the Bankruptcy Code on
April 5, 2010.  The cases were jointly administered by order

entered April 19, 2010.[1]

In the instant motion, Pacific Western Bank ("PWB") seeks lifting of the automatic stay, in order to foreclose Debtors' interest in single asset real estate, described as the Mall of the Mainland, in Texas City, Texas.  The property is located approximately 35 miles southeast of downtown Houston, Texas, and approximately 12 miles northwest of the causeway linking Galveston Island to the mainland of Texas.  It is near the intersection of Interstate Highway 45 and Farm to Market Road 1764, the Emmett F. Lowry Expressway.  PWB seeks relief under Section 362(d)(1) of the Bankruptcy Code, for cause; Section 362(d)(2) of the Bankruptcy Code, for lack of equity and absence of necessity for an effective reorganization; and Section 362(d)(3) for failure of Debtors' compliance with single asset real estate provisions.

The mall originally was built in 1990, and opened in 1991.  The mall was previously anchored by four department stores, in spaces not owned by Debtors:  Dillard's, J.C. Penney, Macy's, and Sears.  Dillard's and J.C. Penney no longer occupy the anchor spaces they previously occupied.

---

[1]Brentwood Group No. 1, Ltd., Brentwood Group No. 2, Ltd., and Brentwood Group No. 3, Ltd. are collectively referred to as "Debtors."

Debtors do not own the anchor spaces occupied by Macy's and Sears, the remaining anchors of the mall.  Debtors also do not own the anchor spaces vacated by Dillard's and J.C. Penney.  According to their most recent disclosure statement, Debtors own 303,077 square feet of space, on 34.81 acres of real property.  (Docket No. 116, at p. 7).

Mayer Makabeh testified he believes he is the president of Debtors' general partner.  He testified that entities controlled by his family, including Debtors, purchased the 34.81 acres now owned by Debtors, plus additional land (the "Excess Land") on the periphery of the mall property, for approximately $16 million during 2006.

In Debtors' disclosure statement, Debtors state that the Excess Land, totaling 31.5488 acres, is owned by Brandywine Group, LLC, which is owned by the Makabeh Family Trust ("MFT").

In Debtors' disclosure statement, Debtors state that an entity affiliated with Debtors, Aveenoo LLC, purchased the space previously occupied by Dillard's.  Mayer Makabeh testified that Aveenoo acquired the Dillard's anchor space for $300,000, shortly after Hurricane Ike struck the Texas gulf coast.[2]

The court takes judicial notice of the proof of claim filed by Pacific Western Bank ("PWB").  On January 15, 2008,

---

[2]The court takes judicial notice that Hurricane Ike came ashore at Galveston, Texas, in September, 2008.

Debtors executed a promissory note payable to PWB, in the original principal amount of $13.5 million.  The note initially had an interest rate of 7.75 percent, and was to mature 18 months later, on July 15, 2009.  On July 28, 2009, Debtors and PWB executed an agreement which, <u>inter alia</u>, extended the maturity date by six months, to January 15, 2010, and provided for amortization of the loan based on a 30 year amortization schedule.[3]  In its proof of claim, PWB asserts that the amount due on the petition date was $13,792,923.50.  The note is guaranteed by Mayer Makabeh and Michael Makabeh.

The note was secured by, <u>inter alia</u>, a deed of trust covering Debtors' real property.  The deed of trust does not cover the Excess Land owned by Brandywine Group, LLC or the space previously occupied by Dillard's, now owned by Aveenoo LLC.

In Debtors' disclosure statement, Debtors state that Debtors conveyed the Excess Land to Brandywine Group, with knowledge of PWB, on the same date that the PWB loan closed. (Docket No. 116, at p. 7-8).

In Debtors' disclosure statement, Debtors state that they invested $3 million as part of the acquisition of the mall

---

[3]The interest rate on the extension was a base index rate, which was, at the time of the extension, 4 percent, plus 0.5 percent, but was subject to a floor of 6 percent.  Thus, under the extension agreement, the effective interest rate was the 6 percent floor rate.

property and the Excess Land.  (Docket No. 116, at p. 7).  Mayer
Makabeh testified that the Makabeh family has contributed an
additional $600,000 to Debtors to enable Debtors to service the
PWB debt.

Jeffrey Goddard, a vice president of PWB, testified
that PWB gave Debtors notice of a monetary default on the note
during December, 2009.

Since its opening, the mall has been operated as a
regional shopping mall.  Jennifer Paulson, a real estate
consultant who was present for the grand opening of the mall in
1991 and previously worked for the mall's original developer,
testified that the mall was originally developed to sell goods to
the local population in the Texas City, Texas area, and to
tourists who were visiting Galveston, Texas.  She testified that
the Mall of the Mainland has been unsuccessful because of
competition from a larger mall, Baybrook Mall, located a few
miles north of the Mall of the Mainland; because tourists
visiting Galveston were not attracted to the Mall of the
Mainland's location; because of a general downturn in the
economy; and because Hurricane Ike caused structural damage to
the mall, and also turned the attention of the consumers who
would typically frequent the mall away from the soft goods sold
there.

Goddard testified that, when he visited the mall, it appeared that less than half of the mall was occupied.  He testified that the mall smelled damp and musty.  He testified that there were water stains on the ceiling.  He testified that several of the urinals in the restroom were not functioning.  He testified that he had complained to the mall's management about the condition of the mall.  He testified that he had not complained about the condition of the mall in writing.

Mayer Makabeh testified that Debtors have hired a roofing company, to replace all the sections of the roof over the occupied spaces of the mall, except for spaces occupied by two tenants (for which Debtors hired the roofing company to patch, rather than replace, the roof).  He testified that Debtors have attempted to address all the roof leaks and plumbing issues.

Debtor's monthly operating reports show a net loss of $839.18 during February and March, 2010, a net loss of $67,353.32 during April, 2010, and a net loss of $66,865.08 during May, 2010.  (Docket No. 129).

Mayer Makabeh testified that ad valorem real property taxes remain unpaid for 2009 and 2010.  The court takes judicial notice of the proofs of claim filed by Galveston County, Texas, in the amount of $259,913.18, and by Dickinson Independent School District, in the amount of $238,741.35, for ad valorem real property taxes.

6

At the hearing on the instant motion, Debtors presented testimony regarding two plans; a business plan, and a plan of reorganization under Chapter 11 of the Bankruptcy Code.  Mayer Makabeh testified that Debtors developed the business plan with the assistance of Mark Kurtz and Jennifer Paulson.

Kurtz, a principal of Arcadian Real Estate Group, testified that he has visited the mall.  He testified that the mall is in a situation of decline, and continues to become more degraded.  He testified that the mall is no longer viable as a regional mall, because the population nearby is relatively sparse by retail standards.  He testified that Baybrook Mall is much more convenient to areas more densely populated with shoppers. He testified that it would be unlikely that the Mall of the Mainland could continue as a regional mall.

Kurtz testified that he, Paulson, and Makabeh reached the conclusion that the mall should be "repositioned" as an outlet mall.  He testified that, in order to reposition the mall, Debtors would need to heavily promote sales with its existing tenants for the holiday season for 2010, reduce the Debtors' secured debt, and recapitalize the mall.  He testified that his business plan was premised on the assumption that PWB's debt would be reduced to $7 million, and that a new investor would invest $5 million in equity into the property.

Kurtz testified that he believes the repositioning of the Mall of the Mainland as an outlet mall would be successful because of its location between Galveston and Houston, and the absence of a competing outlet center in that quadrant of the Greater Houston area.

On cross-examination, Kurtz admitted that he has never been involved with the conversion of a regional mall into an outlet center. He testified that a large portion of his experience has been with the redevelopment of multi-family apartment communities. He testified that he has been involved with the repositioning of several shopping centers, primarily those anchored by grocery stores. He testified that, during the mid-1990's, he owned an interest in a mall in Denver, Colorado. He testified that he was involved with repositioning that mall to serve as a "power center," anchored by big-box retailers such as the Home Depot, PetSmart, and a cinema.

Paulson testified that she believes an outlet center is viable because 660,000 people live within 20 miles, and tourists visiting Galveston would be likely to shop an outlet center as part of their vacation.

Paulson testified that the redevelopment of the mall should be done in two phases. She testified that, during the first 18 months, Debtors should work to stabilize rent and increase the rental income. She testified that the 18 month

8

phase would give Debtors time to work on a repositioning plan
that would include a new name, a new brand, and a management and
leasing program that would take Debtors to the new phase of
signing additional leases and opening new outlet stores with a
plan for a grand reopening of the center.  She testified that the
biggest obstacles in repositioning the mall are changing the
perceptions of consumers and of the retailers who would be the
new tenants after redevelopment.  Paulson testified that, under
the proposed redevelopment, she would primarily be responsible
for generating new income through short term leases, long term
leases, and possibly advertising on blank walls.  She
acknowledged the existence of a struggling outlet mall near the
Mall of the Mainland along Interstate Highway 45, but believes it
is distinguishable from Mall of the Mainland.

      Paulson testified that she is not competent to testify
as to the costs of repositioning the mall.

      Kurtz's analysis of the cash flow of the redevelopment
project he proposes presumes increases in the net operating
income.  Kurtz projects a net operating loss, not including debt
service or the cost of tenant improvements, of $36,876 in year
one, and a net operating income, not including debt service or
the cost of tenant improvements, of $497,342 in year two,
$1,805,226 in year three, $3,179,411 in year four, and $3,914,793
in year five, based on an increase from its current occupancy to

85 percent occupancy.  Kurtz projects that, including the reduced debt service based on a debt amount of $7 million, and the cost of tenant improvements, and also including revenue from the sale of pad sites, Debtors will realize negative cash flow of $641,548 in year one, $1,596,925 in year two, and $844,848 in year three, before reaching positive cash flows of $1,809,551 in year four and $2,695,011 in year five.

Kurtz testified that the repositioning could work with the two current anchor tenants remaining in their current spaces, if they were willing.

Paulson testified that outlet centers differ from traditional regional malls in that a typical regional shopping mall focuses on first season goods.  The stores in a regional mall sell the newest merchandise for each season, acquired from wholesale suppliers, at full price.  She testified that in an outlet center, a majority of the stores will be manufacturer's outlets, vertically integrated, and owned by the manufacturers, selling goods at 25 to 30 percent below regular retail sale prices.

Debtors' Chapter 11 plan, although contained in one document, presents several different scenarios with respect to its treatment of PWB's claims.  The plan provides generally that if PWB accepts the plan, PWB retains its lien, and gets a new note, in satisfaction of its secured claim, with a principal

amount equal to the value of the property as determined by the court, an interest rate of the bank's base rate plus 0.5 percent, with a rate ceiling of 5 percent, to be paid based on a 360 month amortization, and a balloon payment due after five years.

If PWB rejects the plan, PWB retains its lien, and gets a new note totaling the allowed amount of the claim, whether or not PWB makes an election, under Section 1111(b) of the Bankruptcy Code, to have its claim treated as fully secured, or, alternatively, Debtors will choose to have the collateral valued at the confirmation hearing, transfer the collateral to PWB in satisfaction of PWB's secured claim, and receive a credit for the value of the collateral against PWB's claim.

If PWB does not make an election under Section 1111(b), 10 percent of its unsecured claim will be paid, in a note amortized on a 360 month basis at 1 percent interest, with no payments in the first year, and a balloon payment due after five years.

The plan provides that general unsecured creditors (other than a convenience class) get notes for 50 percent of the allowed amount of their claims, if PWB makes a Section 1111(b) election; or they get 10 percent of the allowed amount of their claims, if PWB does not make a Section 1111(b) election, in a note amortized on a 360 month basis at 1 percent interest, with a balloon payment due after five years.

11

The plan provides that, if PWB accepts the plan, a new equity investor will obtain a 24.9 percent limited partnership interest and the entirety of the general partner (which will own a 0.1 percent interest), in exchange for a $1,775,000 new capital contribution.  The remaining 75 percent limited partnership interest will be obtained by MFT, in exchange for a conveyance to the reorganized debtor of the Excess Land.  The plan provides that Debtors will obtain a new $2 million loan, secured by the Excess Land, in order to make payments to creditors.

The plan provides that, if the bank rejects the plan, there will be no new equity contribution, and the Makabeh Family Trust will own 100 percent of the reorganized debtor, in exchange for a conveyance to the reorganized debtor of the Excess Land. In this scenario, the reorganized debtor still intends to use the Excess Land as collateral to borrow funds for the payment of creditors.

Mayer Makabeh testified that the plan of reorganization as presently proposed by Debtors is fluid.  He testified that the situation changes as Debtors discuss different scenarios with potential investors.  He testified that he has not seen a written offer from any investor to contribute $1,775,000 (identified in the plan as the necessary amount) in exchange for the equity of the reorganized debtor.

12

Mayer Makabeh testified that, in the scenario in which Debtors convey the mall to PWB, Debtors would need to raise between $500,000 and $1,000,000 in order to make the payments to creditors other than PWB proposed in the plan.  He testified he believes Debtors will be able to raise those funds either from the sale of some of the Excess Land or through borrowing funds secured by the Excess Land.

On the first day of the hearing on the instant motion, Debtors identified Osama Abdullatif as the proposed new investor under the Debtors' Chapter 11 plan.  Mr. Abdullatif testified that he is prepared to invest, if the details can be worked out. He testified that if the business plan prepared by Kurtz is followed, including a reduction of PWB's claim to $7 million, he would invest.  He testified that, if PWB's claim remains at approximately $13.8 million, he is unwilling to invest, because "there is no way the project would survive, with that kind of debt."  He testified that he has not agreed to accept 25 percent of the equity in a reorganized debtor in exchange for his investment.

James Olson, a commercial real estate appraiser with CB Richard Ellis, hired by PWB to complete an appraisal report, testified that in his opinion, the value of the Debtors' interest

in the mall is $12,550,000.[4]  Olson's written report, dated
January 4, 2010, is in evidence.  Olson states that, in his
opinion, the value of the Excess Land is $4,910,000.

Olson estimated the value of the property based on
three approaches: cost, comparable sales, and income
capitalization.  Under the cost approach, Olson estimated the
cost of building a new replacement of the mall at approximately
$42.5 million.  He depreciated that cost by capitalizing the
income from what is described in the report as "external
obsolescence," and incurable physical deterioration of the
building, deducted what he believes to be the land value, and
reached a value of $12,600,000.  (Bank Exhibit 2, at p. 68).

Under the sales comparison approach, Olson found
comparable the sales of 24 malls sold between 2006 and 2008, plus
one mall sold during 2010, and one mall listed for sale in 2010.
As to the 24 malls sold between 2006 and 2008, Olson analyzed the
sales price of each as a function of the net operating income of
the mall.  Olson states that the sales prices of the 24 malls
ranged from $63.05 to $789.85 per square foot, and net operating
income ranged from $3.90 to $47.08 per square foot.  As to the 24

---

[4]Olson's testimony, on direct and cross examination, lasted
a total of approximately eleven minutes.  Except where his
testimony is specifically identified, the remainder of the
citations to facts or opinions stated by Olson are those in his
written report, Bank Exhibit 2.

malls sold from 2006 through 2008, Olson states that the sales price was highly correlated with the net operating income.  As to these sales, Olson estimated in his report a range of indicated sale prices (normalizing the net operating incomes per square foot of the 24 properties for the net operating income of the Mall of the Mainland) of $52.83 to $108.62 per square foot.

As to the mall sold during 2010, although net operating income was not available to Olson, he states that it was sold for $26.21 per square foot.  Olson states that the listing price of that mall was $48.31 per square foot.  Olson states:  "The sale and the listing indicate a range of value from $26.31 to $48.31 per square foot.  This is lower than the range reflected in the previous set of sales, but is more indicative of recent activity."

Olson estimates a value of $12,400,000 under the sales comparison approach.  This represents an estimated value of $40.91 per square foot.

Under the income capitalization approach, Olson reached estimates of value based on a direct capitalization approach and a discounted cash flow approach.  On the direct capitalization approach, Olson first estimated what he believes to be reasonable rental rates for the separate categories of the food court, jewelers, in-line space, junior anchors, and the theater.  Olson estimates a reasonable rent for the food court of $18.00 per

15

square foot, based on a recent lease of a food court space at the
Mall of the Mainland for that amount.  Olson estimates a
reasonable rent of $20.00 per square foot for jewelry tenants,
based on the recent departure of Zales Jewelers, and rental rates
between $19.18 and $47.19 per square foot for its remaining
jewelry tenants, all of whom are on month-to-month leases.  Olson
estimates a reasonable rental rate of $9.00 per square foot for
inline space.  In making this estimate, Olson relied on what he
believes to be comparable spaces at other local retail centers
near the mall, despite the fact that most of the inline retail
space presently leased is leased for $4.50 to $7.00 per square
foot.  Olson estimates a reasonable rent for the junior anchor
space of $5.00 per square foot, based on current rental rates of
$2.40 to $5.00 per square foot for the junior anchor space, and
rental rates of $6.75 to $7.00 per square foot in junior anchor
spaces in two other regional malls located in Louisiana.  Olson
estimates a reasonable rental rate for the 12-screen theater to
be $16.00 per square foot, based on the current lease, at $15.75
per square foot, escalating to $16.75 in January 2013, and the
lease rates of other cinemas in Texas, Virginia, and South
Dakota, ranging between $8.47 and $27.00 per square foot.

Under the direct capitalization approach, Olson
estimates gross income of $3,669,705.  After deducting $2,286,163
in estimated expenses for real estate taxes, property insurance,

16

common area maintenance, management fees, gross receipts taxes, and reserves for replacement, Olson estimates net operating income of $1,383,542.[5]

Olson calculated value under the direct capitalization approach based on his projection of net operating income divided by a capitalization rate of 10.5 percent.  He derived the capitalization rate by considering the capitalization rates for the 24 comparable sales he analyzed in the comparable sales analysis, a survey of capitalization rates for Class B and Class C regional malls (Olson considers the Mall of the Mainland to be Class B/C), and confidential interviews with market participants. Using the capitalization rate of 10.5 percent yields a value of $13,180,000.  Olson then deducted $600,000 in deferred maintenance cost to reach his final conclusion under the direct capitalization approach of $12,600,000.

Under the discounted cash flow approach, Olson projected the rental rates he described as reasonable (addressed above) over a 10 year period, making assumptions of growth rates of 3 percent for rent, expenses, and inflation, renewal probability of 67 percent, and downtime of 9 months between leases.  Olson used a discount rate of 13 percent, and a terminal capitalization rate of 11 percent, based on nationwide surveys.

---

[5]This amount does not include debt service.

Under the discounted cash flow approach, Olson estimated the
value of the mall to be $12,550,000.

Debtors called Ronald Little as an appraiser.  Little
analyzed the mall based on comparable sales, and a direct
capitalization approach, to reach an estimate of $6,790,000 for
the value of the mall.

Under the comparable sales approach, Little analyzed
nine sales that he believes are comparable, including the sale of
the Mall of the Mainland to Debtors in 2007.[6]  The crux of his
opinion is contained in the following statement in his report:
"It is evident from the data that successful regional malls can
be compared utilizing traditional methodology while unsuccessfl
mall developments often sell for far less and very often are sold
off in parts."  The nine sales which Little believes are
comparable are between 2006 and 2010, and for prices ranging from
$8.14 to $268.42 per square foot.  From these nine sales, Little
identified one sale, that of West Oaks Mall,[7] as most comparable
to Debtors' property.  Little reports the sale price of West Oaks
Mall on December 9, 2009 to have been $21.11 per square foot.  On

---

[6]The court notes that Little analyzed the pricing of the
mall based on the gross square footage of 417,422 square feet,
with respect to the sale to Debtors, but applied the $21.00 per
square foot price he believes is most comparable now to the
303,077 square feet of net rentable area.

[7]The court notes that West Oaks Mall is located
approximately 15 miles west of downtown Houston, Texas.

that basis, together with what he cites as recent conversations
with brokers offering $6,500,000 to $6,800,000 to purchase the
property, he arrives at a value based on comparable sales of
$6,365,000.[8]

Little testified that the seller of West Oaks Mall
during December 2009 acquired the property during 2006 or 2007,
for approximately $100.00 per square foot.  He testified that
malls' values have been declining based on the increase in
capitalization rates due to the continually decreasing
availability of investment capital and financing, and increased
risk based on general economic conditions.

Under the direct capitalization approach, Little used
historical information for 2007 through 2010 regarding income and
expenses.  Little's report indicates that during 2007, at 75
percent occupancy, the mall generated $1,337,253 in net operating
income.  In 2008, at 80 percent occupancy, the mall generated
$1,214,281 in net operating income.  In 2009, at 75 percent
occupancy, the mall generated $1,464,192 in net operating income,
and in the first four months of 2010, at 66 percent occupancy,
the mall generated $270,372 in net operating income.  Little

---

[8]The court notes that, in the text of Little's report, he
identifies his opinion that the value is $20.00 per square foot,
but that directly below that statement he calculates the value
based on $21.00 per square foot.  (Brentwood Exhibit 7, at p. 2).

estimates that the projected net operating income of the mall will be $577,206.  Little reaches this conclusion by projecting revenue based on the revenue collected during February through May of 2010.  He believes that, based on revenue of $177,506.82 in February/March, 2010, $219,008.58 in April, 2010, and $193,196.97 in May, 2010,[9] reasonable revenue will be $190,000 per month.  From this revenue, he deducted what he believes to be a reasonable management fee of 4 percent, and expenses for taxes, insurance, and general and administrative costs.

Little applied a capitalization rate of 8.5 percent. He reached that rate based on investor surveys and the capitalization rates for two of the sales he believes were comparable, the West Oaks Mall sale, on December 9, 2009, and the Katy Mills Mall sale, on April 1, 2007.  Using the direct capitalization rate, as applied to Little's estimate of net operating income, Little arrives at a value opinion of $6,790,000.

At the conclusion of the evidence on the instant motion, counsel for PWB announced that, if the business plan under which Debtors were seeking to operate and seek confirmation of their plan of reorganization was that business plan outlined by Kurtz in his testimony and in the written report he prepared,

---

[9]Little testified that these amounts were derived from Debtor's monthly operating reports.

PWB would make an election under Section 1111(b) of the
Bankruptcy Code, and would reject the plan of reorganization.[10]

The court has considered the appraisal reports and
testimony of both Little and Olson.  The court finds Little's
appraisal not credible.  Little's appraisal relies on data
provided from Debtor's monthly operating reports addressing only
the time since the instant cases were filed.  Little's estimate
of net operating income, on which his conclusion of value under

---

[10]The following colloquy took place:

Tucker (attorney for PWB):  Your Honor, I mentioned a rebuttal
witness, and let me just tell you what I have in mind.  I can
make a proffer.  I don't think this is really controversial, but
my client, Mr. Goddard, would testify he's now heard the Debtor's
business plan.  That was really not available till the day before
the hearing.  He's now heard the Debtor's business plan.  He
would testify that the Bank, if that's the plan, would make the
1111(b) election as permitted under the Bankruptcy Code with
respect to that plan that has been marked as Debtor exhibit 3.
And he would also testify he continues to continues to reject the
plan.  I can call him for that, or I can–

Simon (attorney for Debtors):  If they're willing to stipulate to
that, Your Honor, I understand that the stipulation would be that
if that's the plan, they would make the 1111(b) election to treat
their claim as being fully secured, is that correct?

Tucker:  Under that plan which means they would retain a lien for
$13.8 million–

Simon:  Correct.

Tucker:  --on the property.

Simon:  Understood.  And with that, Your Honor, we would accept
that stipulation.

the direct capitalization approach is based, excludes the holiday
shopping season.  Under the sales comparison approach, Little
determined a value per square foot based on the gross square
footage as to the sale he believes most comparable, but applied
that value to the net square footage of the Mall of the Mainland,
thus reducing his estimate by an additional 28 percent.  In his
report, he made a calculation of the $21.00 per square foot
value, one line after he stated his conclusion that the
appropriate value was $20.00 per square foot.  On the sales
comparison approach, nothing in Little's report or testimony
provides sufficient support for his conclusion that the West Oaks
Mall is most comparable to the Mall of the Mainland.

Olson's report is credible.  Olson's report is
supported by his comparison of the net operating income to the
sales price as to a large number of comparable sales.  Olson's
report gives due regard to the decline in economic conditions,
and supports an adjustment below the entire range of the sales he
believes comparable.  The court finds Olson's use of the sales
comparison approach more credible than the other approaches, with
respect to the instant property.  The court finds, for the
purposes of the instant motion only, that the value of the
Debtors' interest in the Mall of the Mainland, not including the
anchor spaces or the Excess Land, is $12,400,000.

<u>Conclusions of Law</u>

Section 362(d) of the Bankruptcy Code provides in

pertinent part:

(d) On request of a party in interest and after notice
and a hearing, the court shall grant relief from the
stay provided under subsection (a) of this section,
such as by terminating, annulling, modifying, or
conditioning such stay--

(1) for cause, including the lack of adequate
protection of an interest in property of such
party in interest;

(2) with respect to a stay of an act against
property under subsection (a) of this section, if-

(A) the debtor does not have an equity in
such property; and

(B) such property is not necessary to an
effective reorganization;

(3) with respect to a stay of an act against
single asset real estate under subsection (a), by
a creditor whose claim is secured by an interest
in such real estate, unless, not later than the
date that is 90 days after the entry of the order
for relief (or such later date as the court may
determine for cause by order entered within that
90-day period) or 30 days after the court
determines that the debtor is subject to this
paragraph, whichever is later--

(A) the debtor has filed a plan of
reorganization that has a reasonable
possibility of being confirmed within a
reasonable time; or

(B) the debtor has commenced monthly payments
that--

(i) may, in the debtor's sole
discretion, notwithstanding section
363(c)(2), be made from rents or other

23

income generated before, on, or after
the date of the commencement of the case
by or from the property to each creditor
whose claim is secured by such real
estate (other than a claim secured by a
judgment lien or by an unmatured
statutory lien); and

(ii) are in an amount equal to interest
at the then applicable nondefault
contract rate of interest on the value
of the creditor's interest in the real
estate.

11 U.S.C. § 362(d).

Section 362(g) of the Bankruptcy Code provides:

(g) In any hearing under subsection (d) or (e) of this
section concerning relief from the stay of any act
under subsection (a) of this section--

(1) the party requesting such relief has the
burden of proof on the issue of the debtor's
equity in property; and

(2) the party opposing such relief has the burden
of proof on all other issues.

11 U.S.C. § 362(g).

The provisions of Section 362(d)(3) are separated by

the word "or," and thus are read disjunctively.  In the instant

case, Debtors have commenced making payments in an amount equal

to interest at the nondefault contract rate.  Thus, the stay does

not lift under Section 362(d)(3).[11]

---

[11]The court notes that Debtor has argued that the amount
Debtors must pay under Section 362(d)(3) is measured by the value
of the property, as determined by the court, rather than by the
amount of the claim.  The court does not reach this issue, both
because Debtors have commenced the payments required under

24

"Equity" as used in Section 362(d)(2) means the
difference between the value of the subject property and the
encumbrances against it.  <u>Matter of Sutton</u>, 904 F.2d 327 (5th
Cir. 1990).

In the instant case, the amount of the debt owed to PWB
as of the petition date, per its proof of claim, is
$13,792,923.50.  This court has found that the value of the
Debtors' interest in the Mall of the Mainland, not including the
anchor spaces or the Excess Land, is $12,400,000.  The court
concludes that Debtors lack an equity in the property.

The question of whether a property is necessary to an
effective reorganization depends, in the first instance, on
whether the Debtor can show a reasonable prospect for a
successful reorganization within a reasonable time.  The debtor
must do more than manifest unsubstantiated hopes for a successful
reorganization.  <u>In re Canal Place L.P.</u>, 921 F.2d 569 (5th Cir.
1991).

In the instant case, Debtors' hope for reorganization
depends on unreasonable assumptions.  The first of the three
options in Debtors' plan of reorganization, based on Debtors'
business plan for repositioning of the mall and attracting an
investor, depends on an increase in net operating income as a

---

Section 362(c)(3)(B), and because the court has determined that
the stay lifts on other grounds.

result of decreased payment for debt service to PWB.  The
proposal for decreased payment for debt service is premised on
this court's determination of a value near $7 million for
Debtors' interest in the Mall of the Mainland, and on the absence
of an election under Section 1111(b) of the Bankruptcy Code by
PWB.

　　　　Moreover, the participation by the proffered investor,
Mr. Abdullatif, depends on a low value for the mall.  Although
the value the court has ascribed to the Debtors' interest in the
mall for the purpose of the instant motion is below the amount at
which Mr. Abdullatif stated he would not invest, it appears
unlikely that his proposed investment would occur at the value
found by the court for the purpose of the instant motion, in
light of his legitimate concern about the cost of debt service.
He testified, in response to questions on cross-examination, that
debt of $7 million was acceptable, debt of $13.8 million was not.

　　　　Additionally, the proposed reorganization depends on
the use of the Excess Land to borrow an additional $2 million for
payment of creditors.  There is insufficient evidence to support
the conclusion that a reorganized debtor would be able to obtain
such a loan.

　　　　The second of the three options in Debtors' plan of
reorganization, for repositioning of the mall based on the MFT's
contribution of the Excess Land to a reorganized debtor, in

exchange for 100 percent of the equity of the reorganized debtor, likewise depends on the ability of the reorganized debtor to obtain a loan in order to pay creditors.  There is insufficient evidence to support the conclusion that a reorganized debtor would be able to obtain such a loan.  Moreover, there is insufficient evidence that the capital raised through the contribution of new capital and/or the obtaining of a loan would be sufficient to allow a reorganized debtor to implement its proposed repositioning of the mall.

With respect to the last of the three options in Debtors' plan of reorganization, to convey the mall to PWB in satisfaction of its secured claim, the payment of the claims of creditors other than PWB requires that MFT contribute the Excess Land to a reorganized debtor (despite the fact that the mall itself would be owned by PWB at that point), and obtain a loan secured by that land to pay creditors.  There is insufficient evidence to support the conclusion that a reorganized debtor would be able to obtain such a loan.  In addition, while Mayer Makabeh believes the Makabeh Family Trust would indeed make that contribution, there is no written resolution by the Makabeh Family Trust to that effect before the court, nor the underlying documents that created the Makabeh Family Trust.

With respect to each of the three options proposed by Debtors, the plan contemplates that Debtors will make payments of

27

various claims, based on a 30 year amortization, with a balloon payment due after five years.  There is insufficient evidence as to Debtors' ability to make the balloon payments contemplated under any of the three options proposed by Debtors.

In briefing submitted after the hearing on the instant motion, Debtors take the position that PWB has made an election under Section 1111(b) of the Bankruptcy Code, and thus that Debtors' plan is now to convey the mall to PWB in satisfaction of its allowed secured claim, leaving no deficiency claim owing to PWB.  The court notes that PWB has not made an election under Section 1111(b), based on the stipulation announced on the record addressed above.  Moreover, Debtors' plan which allows the Debtors to retain options, at its sole discretion, to either retain the property or convey the property to PWB on the effective date, but requires PWB to make a decision as to an election under Section 1111(b) of the Bankruptcy Code, lacks adequate means for its implementation, and is not proposed in good faith.  As drafted, Debtors' plan would permit the exact sort of bait and switch that Debtors are arguing, after the hearing on the instant motion, has occurred.  The court concludes that Debtors have failed to show a reasonable prospect for a successful reorganization within a reasonable time.  The court concludes that the Mall of the Mainland is not necessary to an effective reorganization.  The court concludes that the stay

28

should be lifted pursuant to Section 362(d)(2) of the Bankruptcy Code.

What constitutes "cause" for the lifting of the stay pursuant to Section 362(d)(1) is not defined in the Bankruptcy Code. Whether cause exists must be determined on a case by case basis based on an examination of the totality of circumstances. In re Reitnauer, 152 F.3d 341, 343 n. 4 (5th Cir. 1998); In re Mendoza, 111 F.3d 1264 (5th Cir. 1997).

The determination of cause pursuant to Section 362(d)(1) with respect to a single asset real estate case is independent of the question of whether the stay lifts under Section 362(d)(3). In re Sterling Development, Inc., 2009 WL 196250 (Bankr. D.N.M. 2009), citing In re Pacific Rim Investments, LLP, 243 B.R. 768 (D. Colo. 2000).

In the instant case, Debtors have made no affirmative offer of adequate protection. Although they commenced payments as required under Section 362(d)(3), Debtors' monthly operating reports indicate that Debtors have a negative cash flow, even before debt service. Mayer Makabeh's testimony indicates that the only way Debtors were able to make payments to service the debt prior to PWB's notice of default was for himself, his family, or entities controlled by them to make additional contributions. There is insufficient evidence that they can and will continue to do so. Moreover, in the totality of the

29

circumstances, this court concludes that the filing of the "bait and switch" plan in the instant case is an independent cause for the lifting of the stay.  The court concludes that the stay should be lifted, for cause, pursuant to Section 362(d)(1) of the Bankruptcy Code.

Based on the foregoing a separate Judgment will be entered granting the "Motion for Relief from the Automatic Stay" (Docket No. 68) filed by Pacific Western Bank.

Signed at Houston, Texas on July 21, 2010.


_____
LETITIA Z. PAUL
UNITED STATES BANKRUPTCY JUDGE